# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| **JOLANDA VAUGHN,** } | |
| } | |
| **Plaintiff,** } | |
| } | |
| **v.** } | **Case No.: 5:17-cv-1528-LCB** |
| } | |
| **SIZEMORE, INC., HYOSUNG** } | |
| **USA, INC., AND MIKE GRAHAM,** } | |
| **INDIVIDUALLY,** } | |
| } | |
| **Defendants.** } | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This is an employment discrimination case filed pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), and the Americans with Disabilities Act, 42 U.S.C. 42 U.S.C. § 12101 et seq. ("ADA"). This matter is presently before this Court on two motions for summary judgment filed by (1) Defendant Sizemore, Inc. (Sizemore), and (2) Defendants Hyosung USA, Inc. (Hyosung) and Mike Graham (Mr. Graham) (docs. 24, & 21). Additionally, two motions to strike are also before the Court filed by (1) Defendant Sizemore, and (2) Defendants Hyosung and Mr. Graham (docs. 37, & 39).  This case was filed on September 8, 2017 (doc. 1) and reassigned to this Court on October 4, 2018 (doc. 31).

In this action, Plaintiff Jolanda Vaughn alleges that while employed by Sizemore as a janitorial supervisor, she was assigned to Hyosung's facility in Decatur, Alabama. During her assignment at the Hyosung facility, Plaintiff had an altercation with Mr. Graham, a Hyosung employee, which culminated in Mr. Graham allegedly striking Plaintiff's hand and pushing Plaintiff, resulting in injuries to her back and requiring her to take time off from work. Sizemore terminated Plaintiff for making a false report regarding the altercation. Yet, Plaintiff argues that Sizemore actually terminated Plaintiff for discriminatory reasons based on her gender and a disability.

Plaintiff filed a five count Complaint against Defendants alleging claims for: (i) disability "discrimination and failure to accommodate under the ADA [, Americans with Disabilities Act, 42 U.S.C. § 12101, *et. seq.*]" against Sizemore; (ii) sex-discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-5, against Hyosung and Sizemore; (iii) retaliation under Title VII and the ADA against Hyosung and Sizemore; (iv) negligent and/or wanton hiring, training, supervision and retention against Hyosung and Sizemore; and (v) assault and battery against all Defendants. (Doc. 1 ¶¶ 7-14.)

Upon review and for the reasons stated below, the Court sustains in part and overrules in part the Defendants' objections as to Plaintiff's evidence in opposition

to Defendants' motions for summary judgment. Additionally, Defendants' motions for summary judgment are due to be granted in part and denied in part.

## I.    DEFENDANTS' MOTIONS TO STRIKE

Defendants' ask the Court to strike the same four (4) documents: (i) "[t]he July 27, 2014 email regarding the advance inquiry"; (ii) "[t]he June 2, 2014 email to Catherine Perkins, Mike Eley, and Marc McClain regarding a back injury"; (iii) "[t]he February 8, 2016 email from [Plaintiff] to Herman Marks regarding reinstating criminal charges against Mike Graham"; and (iv) the state court order approving "[t]he Workers' Compensation Settlement Agreement." (Doc. 37 at 2-5; Doc. 39 at 3-6.) Hyosung and Graham also ask the Court to strike "[t]he September 18, 2015 email from [Plaintiff] to Mike Eley and Andrea Skywark." (Doc. 39 at 4.)

The Court construes Defendants' motions to strike as an objection under Rule 56(c)(2). *See Taylor v. City of Gadsden*, 958 F. Supp. 2d 1287, 1291 (N.D. Ala. 2013), *aff'd*, 767 F.3d 1124 (11th Cir. 2014) (treating motion to strike as an objection).

Objections under Rule 56(c)(2) function like trial objections adjusted for the pretrial setting, and "[t]he burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." Fed. R. Civ. P. 56(c)(2), advisory committee note (2010 amends). Rule 56(c)(2) enables a party to submit evidence that ultimately will be admissible at trial in an

inadmissible form at the summary judgment stage. *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293-94 (11th Cir. 2012). A district court has broad discretion to determine at the summary judgment stage what evidence it will consider pursuant to Rule 56(c)(2). *See Green v. City of Northport*, No. 7:11–CV–2354–SLB, 2014 WL 1338106, at *1 (N.D. Ala. Mar. 31, 2014).

### 1. Objections to the July 27, 2014, and June 2, 2014 Emails

Defendants raise the same objections to the July 27, 2014, and June 2, 2014 emails: the emails were not produced during discovery and the emails are "irrelevant and/or immaterial." (Doc. 37 at 2-4; Doc. 39 at 3-5 (emphasis omitted).)

Plaintiff does not dispute that she always had possession, custody, or control over the emails (*see* Doc. 42 at 1-6; Doc. 43 at 1-5), and Plaintiff uses these emails to support her claims (*see* Doc. 42 at 3, 5; Doc. 43 at 3, 5). Federal Rule of Civil Procedure 26 requires Plaintiff to produce: "a copy - or a description by category and location - of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims . . . ." Fed. R. Civ. P. 26(a)(1)(A)(ii). Plaintiff does not dispute that these materials were encompassed by Sizemore's requests for production (*see* Doc. 42 at 1-6), and the Court finds that the materials were encompassed by Hyosung and Graham's requests for production.[1] Plaintiff does not argue that she failed to

---

[1] Plaintiff argues that the July 27 and June 2, 2014 emails were not responsive to Defendant

4

produce or identify the documents in her original or supplemental response as required by Rule 26(a). (*See* Doc. 42 at 1-6; Doc. 43 at 1-5.)

Rule 37 provides that "[i]f a party fails to provide information . . . as required by Rule 26(a) . . . , the party is not allowed to use that information . . . to supply evidence on a motion . . . unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "The burden of establishing that a failure to disclose was substantially justified or harmless rests on the nondisclosing party." *Mitchell v. Ford Motor Co.*, 318 Fed. App'x. 821, 824 (11th Cir. 2009) (internal quotation marks and citation omitted).

This Court has held that "a failure to disclose is 'substantially justified' when there is a 'justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request.'" *Little v. City of Anniston*, No.: 1:15-CV-954-VEH, 2016 WL 7407094, at *3 (N.D. Ala. Dec. 22, 2016) (citations omitted). In addition, this Court has held that "failure to comply with the mandate of the rule is harmless 'when there is no prejudice to the party entitled to the disclosure.'" *Id.* (citations omitted).

---

Hyosung and Mr. Graham's requests for production. (Doc. 43 at 1, 4.) Hyosung requested that Plaintiff provide all documents that relate to her claims as to all Defendants. (Doc. 39-1 at 9 (request #1).) Plaintiff does not dispute that the emails relate to her claims. (Doc. 43 at 3 (stating that the July 27, 2014 email "is highly relevant with regard to Sizemore"), and at 5 (stating that the June 2, 2014 email "is highly relevant and material with regard to her claims against Sizemore").) Thus, Hyosung and Graham's requests encompassed these emails.

Plaintiff makes four arguments why her failure to provide the requested emails should not result in the Court sustaining Defendants' objections to Plaintiff's use of the challenged emails.

First, Plaintiff argues that "it was unnecessary to exchange [the July 27, 2014 email], as it was already in the possession of the Defendant [Sizemore]" and Sizemore "has had [the June 2, 2014] email in its possession, custody and control . . . ." (Doc. 42 at 1, 4; *see* Doc. 43 at 2, 4.) Plaintiff provides no case authority, and the Court's research has not disclosed any cases for the proposition that a party is justified in failing to produce or identify a document because an opposing party (or one defendant among a group of defendants) possessed that document.

Additionally, Plaintiff's argument does not demonstrate Plaintiff's failure to provide the emails did not prejudice Defendants. Plaintiff conflates Sizemore's knowledge that the emails exist with all of the Defendants' knowledge that Plaintiff intends to use the emails to support her claims. "The purpose of requiring the Plaintiff to at least identify these documents as part of his initial disclosures is to avoid surprise and minimize prejudice." *Little*, 2016 WL 7407094, at *4 (emphasis omitted). Plaintiff's failure to produce or identify the emails contradicts the purpose of disclosure.

If Plaintiff had produced or identified the emails, then Defendants would have had an opportunity to investigate, prepare, and conduct discovery regarding Plaintiff's anticipated use of these emails. Plaintiff fails to show how her failure to produce or identify the emails did not prejudice the Defendants.

Second, Plaintiff argues that "this e-mail would have been responsive to Plaintiff's Request for Production, but Defendant [Sizemore] failed or refused to provide it." (Doc. 42 at 2, 4.) Plaintiff's argument is irrelevant. A defendant's failure's to produce discovery does not mitigate an opposing party's obligation to produce or identify documents.

Third, Plaintiff argues that "she only discovered [the emails] in her possession after the dispositive motion deadline." (Doc. 42 at 2, 3, 5; Doc. 43 at 2, 4.) Plaintiff's argument does not raise a dispute as to whether she was required to comply with Defendants' disclosure requests. Plaintiff has not explained the delay in finding the document. Additionally, if the Court were to accept Plaintiff's excuse as sufficient justification, then future litigants would have little incentive to thoroughly comply with discovery requests.

Fourth, Plaintiff argues that should the Court strike the document Plaintiff "would suffer substantial prejudice . . . ." (Doc. 42 at 3, 5; Doc. 43 at 2, 5.) Plaintiff's argument shows that the emails support her claims, and that Plaintiff should have disclosed the emails to Defendants. Regardless, a court evaluating a motion to strike

does not consider whether the non-producing party will suffer harm as a result of that party's inability to use documents that were not produced in discovery. *See* Fed. R. Civ. P. 37(c)(1).

Thus, the Court sustains Defendants' objections regarding the July 27, and June 2, 2014 emails and the Court grants the motions to strike with respect to these emails.[2]

### 2. Objections to the September 18, 2015 Email, the February 8, 2016 Email, and the Workers' Compensation Settlement Agreement Order

Defendants raise the same objections to the February 8, 2016 email and Workers' Compensation Settlement Agreement Order: the documents are "irrelevant and/or immaterial." (Doc. 37 at 4-6; Doc. 39 at 6 (emphasis omitted).) Hyosung and Mr. Graham also object that the September 18, 2015 email is "irrelevant and/or immaterial." (Doc. 39 at 4 (emphasis omitted).)

"Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401.

#### a. February 8, 2016 Email

Defendants argue that the February 8, 2016 email "establishes an already-known fact: that Plaintiff's criminal charges against Defendant [Mr.] Graham were

---

[2] The Court does not need to reach the parties' arguments regarding relevance or materiality.

dismissed" and "[t]he reason(s) for dismissal of those charges is irrelevant and immaterial to the claims" against Defendants. (Doc. 37 at 4; Doc. 39 at 6.) Plaintiff contends that the "email clarifies that the case was not dismissed on its merits" and "[t]his is relevant because Defendant uses the dismissal of the criminal charges as reason to believe the assault did not occur." (Doc. 42 at 6; Doc. 43 at 6.) Defendants reply that Sizemore and Hyosung did not rely on the dismissal of Plaintiff's criminal complaint to support Sizemore's termination of Plaintiff and Hyosung's investigation conclusions. (Doc. 45 at 3; Doc. 44 at 4.)

Sizemore terminated Plaintiff and Hyosung concluded its investigation prior to the dismissal of the complaint. (*See* Doc. 34-1 at 45 (stating that hearing was held on January 20, 2016).) Thus, the February 8, 2016, email has no relevance to the claims Plaintiff alleges against Defendants and the motion to strike shall be granted with respect to this email.

     *b. Order Approving the Workers' Compensation Settlement Agreement*

Defendants argue that the state court order approving a workers' compensation settlement agreement "establishes that Sizemore's workers' compensation carrier and Plaintiff" agreed on "the payment of workers' compensation benefits[,]" but the order does not "address the validity of Plaintiff's claims and/or . . . Sizemore, Inc.'s assessment of whether Plaintiff was being truthful in making such claims." (Doc. 37 at 5; Doc. 39 at 6.) Plaintiff responds that the order

is "relevant and material to [her] ADA claim and/or for impeachment and/or rebuttal" because the order provides evidence that "Defendant's claim that Plaintiff was terminated due to falsifying a work injury are [sic] suspect and contrary to its actions." (Doc. 42 at 6-7.)

Hyosung and Graham reply that the order does not relate to any claims asserted against Hyosung and Graham because Plaintiff does not argue that Hyosung was involved in resolving her workers' compensation claim. (Doc. 44 at 4-5.) Sizemore replies that its insurance carrier's decision to settle Plaintiff's workers' compensation lawsuit "is of no consequence to a determination of whether the termination decision was motivated by sex or disability discrimination . . . ." (Doc. 45 at 4.)[3]

The order has no relevance to Plaintiff's claims against Hyosung and Graham because Hyosung and Graham had no involvement in the settlement. The settlement order is clearly between the plaintiff and Sizemore, not its insurance carrier; however, the order was entered on May 17, 2018, eight (8) months after this case was filed and over two (2) years after the workers compensation claim was initiated.

---

[3] Sizemore also argues that the settlement agreement includes a provision that notes Sizemore's position disputing that an accident occurred and that her injuries arose out of her job. (Doc. 45 at 4-5.) Sizemore cites the settlement agreement but does not provide a copy of the document. (Doc. 45 at 4.) The Court does not address Sizemore's arguments as they relate to the substance of the actual settlement agreement because the document was not provided to the Court and it is not easily accessible. *See* Fed. R. Evid. 201(b) (courts may judicially notice a fact that can "readily" be determined from a source).

Clearly the order is not relevant to a decision made by Sizemore approximately two years prior to the order.[4]  Thus, the order is not relevant for showing Sizemore's motivation to terminate Plaintiff.

Accordingly, the order has no relevance to the claims Plaintiff alleges against Defendants and the motion to strike shall be granted with respect to this order.

### c.  September 18, 2015 Email

Hyosung and Mr. Graham argue that Plaintiff sent the September 18, 2015 email to a Sizemore employee, Hyosung and Mr. Graham were not involved in conduct discussed in the email, and the email does not relate to Plaintiff's claims against them. (Doc. 39 at 4.) Plaintiff does not argue that the email relates to her claims against Hyosung and Mr. Graham (Doc. 43 at 3-4), and Plaintiff has not cited the email in her brief opposing their motion (*see* Doc. 33).[5]

Plaintiff does not use the challenged email against Hyosung and Mr. Graham. Therefore, Hyosung and Mr. Graham's objection to the email is moot. Thus, the Court overrules the objection with respect to this email as moot.

### 3.  Summary

---

[4] The Court does take judicial notice that workers' compensation settlement order evidences an employer-employee relationship between the Plaintiff and Sizemore pursuant to the Alabama Workers' Compensation Act, § 25–5–1 et seq., Ala. Code 1975. *See* Rule 201, Fed. R. Civ. P.

[5] Plaintiff argues the email is relevant to her claim against Sizemore. (Doc. 43 at 4.) Sizemore has not moved to strike this email. (*See* Doc. 37.)

The Court sustains Defendants' objections and grants the motions to strike with respect to: (i) the July 27, 2014 email; (ii) the June 2, 2014 email; (iii) the February 8, 2016 email; and (iv) the state court order approving the Workers' Compensation Settlement. The Court overrules Hyosung and Mr. Graham's objection and denies the motion to strike with respect to the September 18, 2015 email.

## II. SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

When considering a summary judgment motion, the Court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences in favor of the non-moving party. *White v. Beltram Edge Tool*

*Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015). "[A]t the summary judgment stage[,] the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "'Genuine disputes [of material fact] are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant. For factual issues to be considered genuine, they must have a real basis in the record.'" *Evans v. Books-A-Million*, 762 F.3d 1288, 1294 (11th Cir. 2014) (quoting *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996)). "A litigant's self-serving statements based on personal knowledge or observation can defeat summary judgment." *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018); *see Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) ("To be sure, Feliciano's sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage."). Even if the Court doubts the veracity of the evidence, the Court cannot make credibility determinations of the evidence. *Feliciano*, 707 F.3d at 1252 (citing *Anderson,* 477 U.S. at 255). However, conclusory statements in a declaration cannot by themselves create a genuine issue of material fact. *See Stein*, 881 F.3d at 857 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

In sum, the standard for granting summary judgment mirrors the standard for a directed verdict. *Anderson*, 477 U.S. at 250 (citing *Brady v. Southern R. Co.*, 320

U.S. 476, 479–480 (1943)). The district court may grant summary judgment when, "under governing law, there can be but one reasonable conclusion as to the verdict." *Id.* at 250. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party . . . . If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (internal citations omitted).

## III.    FACTUAL BACKGROUND

Sizemore offers janitorial, staffing and security services to businesses. (Doc. 26-1 at 2, ¶ 2.) Hyosung manufactures textile reinforcement materials for use in tires. (Doc. 26-3 at 8 (25:18-21).) Sizemore provides janitorial and security services on-site at Hyosung's Decatur, Alabama facility. (Doc. 23-2 at 3, ¶ 5.) Sizemore and Hyosung's contract permits Hyosung to "reasonably request the removal of any Sizemore employee . . . ." (Doc. 34-1 at 49 (§ 6).)

From June 2008 until October 5, 2015, Plaintiff worked for Sizemore as the janitorial supervisor at Hyosung's facility in Decatur. (Doc. 26-1 at 2, ¶ 3; Doc. 23-2 at 3, ¶ 5.) During the relevant time period, Hyosung's Human Resources Director was Jim Garber and the Plant Manager was John Gormen. (Doc. 23-2 at 2, ¶ 2; Doc. 23-1 at 42 (161:21-162:5).)[6]

---

[6] Hyosung and Mr. Graham fail to cite evidence that shows that John Gormen was the Plant Manager. (*See* Doc. 22 at 3, ¶ 3.) Regardless, Plaintiff does not dispute this fact. (*See* Doc. 33 at 5.)

Plaintiff performed janitorial services and supervised Sizemore's janitorial staff at Hyosung. (Doc. 26-1 at 2, ¶ 3.)[7] Plaintiff reported to Mike Eley, Sizemore's regional manager, who worked in Carrollton Georgia. (Doc. 26-1 at 2, ¶ 3; Doc. 26-3 at 10 (33:11-21).) During the relevant time period, Andrea Skywark was Sizemore's highest level human resources employee (Doc. 26-1 at 2-3, ¶ 4), and Preston Sizemore was Sizemore's President and Chief Executive Officer (Doc. 26-2 at 2, ¶ 2).

Plaintiff received and signed a copy of Sizemore's policy. (Doc. 26-3 at 51.) The policy directed Plaintiff to "report incidents of sexual harassment as soon as possible after their occurrence to [her] Supervisor and/or Division manager." (*Id.* at 51-52.) Plaintiff also received and signed a Sizemore document listing "[c]auses for disciplinary action – up to and including immediate dismissal." (Doc. 26-3 at 53 (normal capitalization applied and emphasis removed).) This document lists "[f]alsification of information . . . in order to . . . retain a job" an offense worthy of discipline or discharge. (*Id.*)

Sometime in 2015 (prior to August 25, 2015), Plaintiff explained that she was in the Hyosung break room and Mr. Graham entered "the break room, snatch[ed] the paper up and put it on top of his lunch box and started just screaming and cussing at

---

[7] Plaintiff set her own work hours and generally worked from 3:00 a.m. until 10 or 11:00 a.m. (Doc. 26-3 at 10-11 (36:16-18; 37:14-16).)

me because he thought I was going to throw it away again . . . ." (Doc. 26-3 at 40 (154:5-9).) Plaintiff stated that she reported the incident to Mr. Graham's Hyosung supervisor, Mark Swanner. (*Id.*at 40 (154:12-13).)

On August 24, 2015, after 5:00 p.m., Plaintiff was at work training a new employee and was pulling trash in Mill 2. (Doc. 26-3 at 16 (60:13-20; 64:20).) Plaintiff saw a cell phone in the main aisle (an area for forklifts and tow motor truck traffic), and she did not see anyone in the area. (*Id.* (60:21-23).) Plaintiff picked up the phone and went to the break room, and the area for smoking. (*Id.* (60:23-61:2).) She did not see anyone in these locations or around the looms. (*Id.* (60:2-3).)[8] Plaintiff went to Mr. Gorman's office, which was located in a different building, but Plaintiff could not give him the phone because a corporate office employee was in Mr. Gorman's office. (*Id.* at 17 (61:8-9; 62:16-17).) Plaintiff told her coworker, Rhonda Brewer, that Plaintiff had the phone; Plaintiff could not find anyone in Mill 2. (*Id.* at 18 (65:12-15).) Plaintiff took the trash cart back to the cage, secured the phone in her glove box, and went home. (*Id.* at 17-18 (64:23-65:1).)

Plaintiff contacted a Sizemore manager, Melinda Rusk, who works in Madison, Alabama, and informed Ms. Rusk that she had found a phone. (Doc. 26-3 at 23 (77:8-9, 86:14-87:4).) Plaintiff asked Ms. Rusk if there was a lost and found

---

[8] A loom is defined as "a frame or machine for interlacing at right angles two or more sets of threads or yarns to form a cloth." *Loom*, Merriam-Webster Online Dictionary (2019) (available at https://www.merriam-webster.com).

policy because Ms. Rusk worked for Sizemore security at Hyosung. (*Id.* (87:5-13.) Plaintiff also reviewed a book for a policy. (*Id.* (87:14).) Sizemore, however, did not have a lost and found policy. (*Id.* at 17 (62:22-63:1).)

On August 25, 2015, around 2:00 p.m., Plaintiff returned to work and started to pull trash. (*Id.* at 18 (67:18-68:5).) Plaintiff saw Rowdy Carden, a Hyosung employee, on a towmotor truck coming out of Mill 2, and Plaintiff asked him if he worked the previous night and knew anyone who lost a cellphone. (*Id.* at 18 (68:6-15).) Mr. Carden told Plaintiff that Mr. Graham lost his cellphone, and Plaintiff told Mr. Carden to tell Mr. Graham that Plaintiff found his phone, secured his phone, and would bring it to Mr. Graham. (*Id.* at 18 (68:16-20).) Plaintiff continued with her duties because Mr. Graham's shift did not start until 4:00 p.m. (*Id.* at 18-19 (68:22-69:3).)

Later during her shift, Plaintiff went to Mill 2 and was walking down the aisle and approached Mr. Graham. (*Id.* at 19 (69:17-70:1).) Mr. Graham was irate because Plaintiff had his phone in her hand. (*Id.* (70:1-2).) Mr. Graham "began yelling and cursing [at Plaintiff] and said to get away from him . . . ." (Doc. 26-3 at 56.) Mr. Graham came out from underneath a creel rack and Plaintiff asked him what was wrong. (Doc. 26-3 at 19 (70:3-5).)[9] Mr. Graham "snatched the phone out of

---

[9] A creel is defined as: (1) "a wicker basket," or (2) "a bar with skewers for holding bobbins in a spinning machine." *Creel*, Merriam-Webster Online Dictionary (2019) (available at https://www.merriam-webster.com).

[Plaintiff's] hand and hit [her] hand, and [she] started to cry . . . ." (*Id.* (70:5-7).) Mr. Graham told Plaintiff that he should go to Ron Hamilton, the Hyosung maintenance manager, [to inform "on [Plaintiff]]," and Plaintiff asked him, "For what? I found your phone." (*Id.* (70:8-9).) Mr. Graham told Plaintiff that she needed to stop crying or he would "give [her] a reason to cry when [he] whip[ped] her ass and put [her] in the hospital." (*Id.* (70:10-13).) Mr. Graham called her a "lying B[itch]" during the altercation. (*Id.* at 27 (103:19-23).)

Plaintiff explained that after she returned the cell phone to Mr. Graham in the southwest corner of Loom 21 she proceeded to gather the trash from in the east side of Loom 21, an area where she was "backed in a corner." (Doc. 26-3 at 19 (70:14-16; 71:3-6).) John Rittenberry, who was in Mill 2, walked over to Mr. Graham and stood with Mr. Graham and looked at his phone. (*Id.* (70:19-20).) Then, Mr. Rittenberry walked about 50 to 100 feet towards and behind certain looms where he and Kathy Patterson were working. (Doc. 26-3 at 19 (70:22-71:2).)[10]

Mr. Graham approached her and "[h]e just took his hand and pushed [her] and said, . . . [']Get the fuck out of my way, get away from me.'" (Doc. 26-3 at 19 (71:6-

---

[10] A factual discrepancy exists between Plaintiff and the witness' statements about the particular movements of Plaintiff after she returned the cell phone to Mr. Graham. Mr. Rittenberry stated that Plaintiff walked over to "where I was working, still in a loud manner, cussing, asking me several times, 'What the hell's wrong with Mike?' I Informed her I did not appreciate vulgar language and told her this conversation is over, I didn't want to hear it." (Doc. 26-1 at 14.) The Court does not need to determine Plaintiff and the witnesses' precise locations to evaluate the pending motions.

11).) Plaintiff "hit the loom" with her head and shoulder, and twisted her body as she tripped over an electrical cord. (Doc. 26-3 at 19 (71:11-18).) Plaintiff walked towards the back of the facility and she saw Mr. Rittenberry and Ms. Patterson. (Doc. 26-3 at 21 (79:2-8).) Plaintiff states that she asked Mr. Rittenberry and Ms. Patterson whether they saw Plaintiff's altercation with Mr. Graham. (Doc. 26-3 at 21 (79:13-18), 42 (161:1-6).) Plaintiff states Mr. Rittenberry replied, "That's between you and Graham. I'm not getting involved." (*Id.*) Plaintiff also testified that Ms. Patterson "shook her head no and pointed to her ears and her eyes . . . ." (Doc. 23-1 at 21 (79:13-18).) [11]

Plaintiff called Ms. Rusk to report the incident and asked her to photograph Plaintiff's back. (Doc. 26-3 at 21 (78:7-8), 24 (90:2-7).) On August 26, 2015, Ms. Rusk took photographs of Plaintiff. (Doc. 26-3 at 24 (90:17-23).)

On August 25, 2015, at 8:30 p.m., Plaintiff emailed Mr. Eley, Mr. Hamilton, and Mr. Gorman. (Doc. 26-3 at 56; Doc. 26-1 at 3, ¶ 5.) [12] Plaintiff wrote that the

---

[11] Ms. Patterson explained her own perception of the subsequent events:

> She then approached me . . . screaming and asking me several times, "What the hell is his problem?" There were times I could not understand what she was trying to say as she was screaming. I informed [Plaintiff] by putting my hands up and telling her to leave, I didn't want to hear it.

(Doc. 26-1 at 16.)

[12] Mr. Graham and Hyosung assert that Plaintiff also sent the email to Mr. Garber. (Doc. 22 at 9 ¶ 38.) The header of the email shows that Plaintiff did not send the email to Mr. Garber. (Doc. 26-3 at 56.)

previous day she found a cell phone, and she explained the altercation involving Mr.

Graham. (Doc. 26-3 at 56.) Plaintiff noted that as a result of the altercation:

> I was crying so bad and shaking I had to call someone to get me home.
> All I did was return a [cell phone] I found on the floor, this is not the
> first time he cussed me and threatened me in front of Hyosung
> employees. I am scared of what he might do to me now.

(*Id.*)[13]

About five hours after the altercation, on August 26, 2015, at 1:25 a.m.,

Plaintiff emailed Mr. Eley stating: "With him pushing and making me twist my back

I am going to need to go to doctor. It is hurting really bad. And several of his co

workers saw him . . . ." (Doc. 26-3 at 57.) Later that same day, at 10:00 a.m., Plaintiff

completed a statement in which she reported in relevant part:

> I walked over to Mill 2 and asked [Mr.] Graham "Are you missing a
> phone"; he got very upset and began cursing me and grabbed [the]
> phone out of my hand. I started crying and asked him what was wrong?
> He told me to get way from him and said I should go to Ron [Hamilton]
> on you. I asked what for? I found your phone laying in aisle way and
> didn't know who's it was and want to turn it in to John Gorman but he
> had someone in his office. [Mr. Graham] called me a lying B[itch] and
> said he would give me something to cry about by whooping my A[ss]
> and sending me to the hospital. He came around to the side of loom
> where I was and shoved me into the loom and said get the F[uck] away
> from me and he proceeded to crawl under yarn and go between creel
> racks. I walked off crying and shaking so hard.

---

[13] Plaintiff stated that she made a mistake in her letter regarding the word "away." (Doc. 23-1 at
25 (95:9-14); Doc. 33 at 6, ¶ 39.)

Plaintiff identified Mr. Rittenberry and Ms. Patterson as the coworkers referred to in her
email. (Doc. 26-3 at 27 (101:8-21).)

(Doc. 26-3 at 58-59.)

Sizemore considered the incident to be a workers' compensation injury and referred Plaintiff to a medical services provider, the Occupational Health Group (OHG). (Doc. 26-1 at 4, ¶ 8.) On August 26, 2015, Plaintiff visited OHG. (Doc. 26-3 at 60.) The OHG doctor diagnosed Plaintiff as having contusions on her back, neck and shoulder, and recommended a "[n]o work" restriction. (*Id.* at 61-62.) Sizemore placed Plaintiff on workers' compensation leave and submitted a claim to its workers' compensation insurer. (Doc. 26-1 at 4, ¶ 8.)[14]

On August 27, 2015, Plaintiff met with Mr. Swanner and Mr. Garber. (Doc. 26-3 at 41 (159: 8-9).) During the meeting, Plaintiff described the altercation with Mr. Graham. (Doc. 23-1 at 42 (164:19-20).) Mr. Swanner told Plaintiff that Mr. Graham "had a reputation for blowing up" over his work, and Mr. Swanner coached Mr. Graham "on how to approach [Plaintiff] over the cellphone incident." (Doc. 26-3 at 41 (159:14-20).) Mr. Garber advised Plaintiff "to consider getting a warrant for Mr. Graham." (Doc. 26-3 at 43 (165:10-12).) Mr. Garber and Mr. Swanner advised Plaintiff to follow Sizemore and her doctor's instructions. (Doc. 26-3 at 43 (166:13-19).)

---

[14] Sizemore paid Plaintiff in full through September 11, 2015, and Sizemore's workers' compensation insurance paid Plaintiff temporary total disability benefits. (Doc. 26-1 at 4, ¶ 8.)

Mr. Garber determined that an investigation was necessary since Plaintiff's allegations involved actions by a Hyosung employee. (Doc. 23-2 at 4, ¶ 8.) Mr. Garber investigated the matter with Benji King, the union representative at Hyosung. (*Id.*) Mr. Garber obtained information from Mr. Graham, Ms. Patterson, and Mr. Rittenberry. (*Id.*) Mr. Garber stated that "[w]e were unable to locate any witness, other than [Plaintiff], who stated that Mr. Graham had in fact hit or struck or shoved [Plaintiff]." (*Id.* at 5, ¶ 9.)

On September 1, 2015, Plaintiff filed a complaint in the Municipal Court of Decatur, Alabama against Mr. Graham alleging that Mr. Graham pushed Plaintiff into a machine. (Doc. 34-1 at 15.) On September 8, 2015, Plaintiff again visited OHG and complained that her pain had worsened. (Doc. 26-3 at 63.) The OHG recommended a "[n]o work" restriction. (Doc. 26-3 at 64.)

Sizemore communicated with Hyosung's managers about the incident with Plaintiff and Mr. Graham. (Doc. 26-1 at 5, ¶ 9.) The managers stated that Mr. Graham and the witnesses contradicted Plaintiff's allegation that Mr. Graham pushed Plaintiff. (*Id.*) Ms. Skywark asked Sizemore's Director of Corporate Security, Allan Davis, to investigate the incident. (*Id.* at 5, ¶ 10.) Mr. Davis worked with Hyosung and the employees' union representative to schedule interviews. (*Id.*) In the presence of Mr. Garber and Mr. King, Mr. Davis separately interviewed

Hyosung employees Mr. Graham, Mr. Rittenberry, Ms. Patterson, Randy Hinkle and Dean Menean. (*Id.*)

In his interview, Mr. Graham stated, around 7:00 to 7:30 p.m., Plaintiff approached him at work with his phone, and he stated, "I then came up from under the grill (piece of equipment), and told her to give me my 'damn' phone, reached out, and grabbed my phone out of her hand." (Doc. 26-1 at 12.) He stated, "Once I got my phone . . . I did grab it out of her hand, and that was the only time I came in contact with her. . . . John Rittenberry and Kathy Patterson, were present and witnessed [Plaintiff's] actions." (*Id.*)

Mr. Rittenberry signed a statement describing the altercation:

[Plaintiff] came up to me and asked if I knew where Mike Graham was. I noticed she had a cell phone in her hand. I state[d] he was one loom over working. I then watched her approach Mike . . . and heard Mike ask her to put it back where it was several times, to which I never saw her give it back.

At this time, [Plaintiff] became very aggressive, very "mouthy", and [I] heard her say a cuss word. Mike Graham, since not getting his phone back from [Plaintiff], came over to me to witness what had occurred; told him I had been watching the whole time. During this time, and subsequently afterwards, I did not see Mike Graham commit any act of physical confrontation, he only wanted to get his cell phone back. He certainly did not push, strike, or throw [Plaintiff] against any machine.

(Doc. 26-1 at 14.)[15] Ms. Patterson also signed a statement explaining the altercation:

---

[15] Plaintiff contends that Mr. Rittenberry's signed written statement is not credible, because Mr. Rittenberry provided a statement to Mr. Garber that "[Plaintiff] put phone where Mike told her to." (Doc. 32 at 7, ¶ 16 (citing Doc. 32-2 at 28).) Plaintiff cites Mr. Garber's notes of Mr. Garber's

> I heard yelling and screaming so I walked up front to see what was happening. When I got up front, I observed [Plaintiff] . . . screaming, yelling at Mike Graham, who was walking away towards #22. She continued her loud hollering as he walked away. I did not hear Mike say anything to her, and while I was there, he never came close to her, much less, pushed or shoved her.

(Doc. 26-1 at 16.)

Mr. Hinkle, a Hyosung employee, signed a statement about his observations of Plaintiff after the altercation:

> I observed [Plaintiff] on the scrubber, driving it to clean the floors. I surmise the time was between 12:30 am to 1:30 am.

> I saw her get off and on the riding scrubber several times to move items to continue cleaning. She had no problem that I observed getting off and on to work. I have observed [Plaintiff] many times on 3rd shift. She acted as usual this night as she always does.

(Doc. 26-1 at 18.) Additionally, Mr. Menean signed a statement related to his observations of Plaintiff after the altercation:

> I work the 3rd shift at Hyosung (0000-0800), and on August 26th, I observed [Plaintiff] driving/running the scrubber, approximately around 2 am. I watched her driving it as well as her [sic] get off and on several times. When I saw her, it appeared she had no issued [sic] at all getting on and off. She was moving items to continue her scrubbing.

(Doc. 26-1 at 20.)

---

meeting with Mr. Rittenberry. (*See* Doc. 32-2 at 28.) Mr. Rittenberry did not sign these notes verifying the notes' accuracy. (*See id.*) Mr. Garber's notes are not Mr. Rittenberry's prior statements. Plaintiff appears to imply that certain witness statements are not credible. Plaintiff states that Mr. Rittenberry, Ms. Patterson, Mr. Hinkle, and Mr. Menean did not type up their own statements (Doc. 32 at 7-8, ¶¶ 16-18), but Plaintiff does not explain why witnesses must type their own statements before signing them.

Mr. Davis attempted to schedule an interview with Plaintiff, but Plaintiff did not meet with him. (Doc. 26-1 at 7.) Plaintiff testified Ms. Skywark told Plaintiff not to meet with Mr. Davis. (Doc. 26-3 at 32 (123:1-124:4).) On September 23, 2015, Plaintiff emailed Ms. Skywark about the interview:

> I received a call tonight around 9:15 from [Mr. Davis] wanting to meet with me at his hotel on 9-24-15 to discuss speeding up the workers comp process and to see how I am doing physically. I am under a doctors care and do not feel I need to meet with him seeing as how I do not work for him or in security. But I did let him know I saw my job at Hyosung was posted on indeed website. I will contact my attorney in the morning for his need to know that Sizemore is wanting to hurry up and get this over with and closed with workers comp as fast as we can as [Mr. Davis] stated to me. I am not going to meet with him, he is not my doctor nor has anything to do with medical injuries. Please advise him of this.
>
> As you stated I am not to have or do anything pertaining to work while on workers comp.

(Doc. 26-3 at 66 (errors in original).)[16]

In early October 2015, Mr. Sizemore met with Ms. Skywark to discuss the investigation results. (Doc. 26-1 at 7, ¶ 16; Doc. 26-2 at 2, ¶ 3.) They concluded that Plaintiff's report was false and decided to terminate Plaintiff's employment. (Doc. 26-1 at 7, ¶ 16; Doc. 26-2 at 2, ¶ 3.) Around this same time, the workers'

---

[16] On September 25, 2015, Plaintiff emailed Ms. Skywark that Plaintiff's injuries prevent her from driving. (Doc. 34-1 at 34.) Plaintiff stated that Mr. Davis "could have come to me but didn't offer so." (*Id.*)

compensation program sent Plaintiff a letter informing her that her benefits had been canceled. (Doc. 26-3 at 33 (127:17-19).)

On October 5, 2015, Plaintiff contacted Ms. Skywark about the workers' compensation benefits. (Doc. 26-3 at 33 (127:19-23).) Ms. Skywark told Plaintiff that the company was terminating her employment because Plaintiff filed an unexplainable workers' compensation claim. (Doc. 26-1 at 7, ¶ 16; Doc. 26-3 at 33 (128:1-3).) Sizemore did not hire a replacement janitorial supervisor, but did hire a maintenance assistant. (Doc. 26-1 at 9, ¶ 20.)

On January 28, 2016, Plaintiff filed an EEOC "Charge of Discrimination" against Hyosung and Sizemore. (Doc. 1-1 at 1-4.)

## IV.    ANALYSIS

The Court shall now examine Plaintiff's federal claims. For the reasons set forth herein, Plaintiff's Count I asserted against Sizemore, alleging disability discrimination and failure to accommodate under the ADA, is due to be denied; Count II asserted against Hyosung and Sizemore, alleging sex-discrimination under Title VII, is due to be denied; and Count III asserted against Hyosung and Sizemore, alleging retaliation under Title VII and the ADA, is due to be denied.

For the reasons discussed below, the Court does not need to address Plaintiff's state claims, Count IV (negligent and/or wanton hiring, training, supervision and

retention asserted against Hyosung and Sizemore) and Count IV (assault and battery asserted against all Defendants).

## A. Disability Discrimination – Disparate Treatment

Plaintiff bases her ADA disability discrimination claim first on disparate treatment. (Doc. 1 ¶ 25.) Plaintiff contends that Sizemore terminated her because she was injured during her altercation with Mr. Graham necessitating temporary leave. (Doc. 32 at 26.)

The ADA states that: "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . discharge . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The Supreme Court's burden shifting framework for Title VII cases, *see McDonnell Douglas Corp. v Green*, 411 U.S. 792, 802-03 (1973), applies to ADA disparate treatment cases. *See Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004). Initially, a plaintiff must establish a prima facie case of disparate treatment by showing that he or she: (1) is disabled; (2) is a "qualified individual," meaning that, with or without reasonable accommodation, he or she is able to perform the essential functions of the job; and (3) was discriminated against because of her disability. *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1255-56 (11th Cir. 2007).

A plaintiff may establish the third prima facie case element by *"identifying an individual who replaced him or was treated better than he was who was not a member of his protected class . . . ." Morris v. Emory Clinic, Inc.*, 402 F.3d 1076, 1082 (11th Cir. 2005); *Hill v. Branch Banking & Tr. Co.*, 264 F. Supp. 3d 1247, 1262 (N.D. Ala. 2017) (stating that a plaintiff "may establish causation for the purpose of summary judgment by use of a similarly-situated comparator."); *c.f. Payne v. Goodyear Tire & Rubber Co.*, 760 Fed. App'x 803, 810 (11th Cir. 2019) (explaining that the plaintiff did not establish a prima facie case because the plaintiff failed "to identify a similarly-situated comparator without a disability who was not fired after performing as poorly as [the plaintiff]."). A plaintiff may also use circumstantial evidence to raise a reasonable inference of the employer's discriminatory intent. *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)

If the plaintiff establishes a prima facie case, the defendant has the burden to articulate a legitimate non-discriminatory reason for the adverse employment action. *Wascura v. City of S. Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001). The defendant must "raise[] a genuine issue of fact as to whether it discriminated against the plaintiff[,]" but the defendant "need not persuade the court that it was actually motivated by the proffered reasons." *Id.* at 1242-43 (internal quotation marks and citation omitted).

Once the defendant satisfies its burden of production, "the plaintiff must show that the proffered reason really is a pretext for unlawful discrimination." *Rioux v. City of Atlanta*, 520 F.3d 1269, 1275 (11th Cir. 2008) (internal quotation marks and citations omitted). The plaintiff may demonstrate pretext by showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Id.* (internal quotation marks and citations omitted). A plaintiff may show pretext using circumstantial evidence "so long as the circumstantial evidence raises a reasonable inference that the employer discriminated against the plaintiff . . . ." *Smith*, 644 F.3d at 1328.

Sizemore argues that Plaintiff cannot state a prima facie case because Plaintiff cannot show evidence of discrimination. (Doc. 25 at 15.)[17] Sizemore argues that Plaintiff is not able to show that an able-bodied person replaced Plaintiff or that Sizemore treated an able-bodied person differently than Plaintiff. (*Id.* at 15-18.) Plaintiff states that her "disability discrimination claim does not rest solely on who replaced her in the position, but rather on how she was treated after her August 25, 2015 injury and terminated." (Doc. 32 at 25.)[18] Plaintiff appears to argue that she

---

[17] Sizemore states that "although [it] deems it unlikely that [Plaintiff] is an individual with a disability, [it] will focus its arguments . . . on the . . . lack of evidence that [Plaintiff] was discriminated." (Doc. 25 at 14.)

[18] Plaintiff describes the events after her altercation with Mr. Graham. (*See* Doc. 32 at 25-27.) Plaintiff does not provide any additional argument about the person "who replaced her." (*See id.*)

was discriminated against because she was not allowed to work "on light duty" subsequent to her altercation with Mr. Graham while other employees were allowed to do so. (*Id.* at 27.)

### i. Whether Sizemore replaced Plaintiff with an able-bodied person

Sizemore argues that Plaintiff was not replaced with an able-bodied person because Sizemore created a new position instead of filling Plaintiff's former position, and Plaintiff has not presented evidence of the employee's able-bodied status. (Doc. 25 at 15.) Ms. Skywark stated: "Sizemore did not hire any replacement for [Plaintiff] as the janitorial supervisor. Instead Sizemore later hired a maintenance assistant who was responsible for assisting Hyosung's Maintenance Manager, performing some maintenance, and also overseeing Sizemore's janitorial staff." (Doc. 26-1 at 9, ¶ 20.) In response, Plaintiff provides no evidence or argument that she was replaced by an able-bodied person. (*See* Doc. 32 at 24-27.) Thus, Plaintiff has not shown that Sizemore found a replacement for her role or replaced her with an able-bodied person. Therefore, Plaintiff's argument that her replacement demonstrates Sizemore discriminated against her based on her disability is

---

Plaintiff does not identify which actions after her altercation constitute discrimination based on her disability and she also provides no argument or citation to an authority to support the proposition that any particular action constitutes discrimination.

unpersuasive. Accordingly, Plaintiff fails to establish a prima facie case premised on showing Sizemore replaced her with an able-bodied person.

### ii. Whether Sizemore terminated Plaintiff because of her disability

Sizemore argues that Plaintiff "was terminated because . . . she submitted a false report of workplace assault and injury." (Doc. 25 at 15.) Plaintiff argues that "Sizemore's failure to conduct a thorough investigation and deliberate burying of evidence that supported [her] claim is evidence of [pretext]." (Doc. 32 at 29.)

Ms. Skywark and Mr. Sizemore declared that they decided to terminate Plaintiff for "submit[ing] a false report regarding the Graham incident and injury" based on Plaintiff's contradictory statements and the statements from Mr. Graham and the witnesses. (Doc. 26-1 at 7, ¶ 20; Doc. 26-2 at 3, ¶ 4.) Mr. Graham, Mr. Rittenberry, and Ms. Patterson's statements contradict Plaintiff's account of the altercation. (*Compare* Doc. 26-1 at 11-12, 14, 16, *with* Doc. 26-3 at 56.) In addition, Mr. Hinkle and Mr. Menean's statements contradict Plaintiff's statement that after the altercation she was unable to work. (Doc. 26-1 at 18, 20, *with* Doc. 26-3 at 56.) There is evidence that supports Sizemore's decision to terminate Plaintiff for falsifying a report. Sizemore has satisfied its burden to articulate a legitimate non-discriminatory reason for terminating Plaintiff.

Plaintiff asserts that Sizemore failed to conduct a proper investigation because Sizemore failed to consider certain facts: Plaintiff reported the incident to Ms. Rusk

and Ms. Rusk took photos of Plaintiff; Plaintiff sent the photos to Ms. Skywark and

Mr. Eley; on August 27, 2015, Ms. Skywark contacted the Department of Labor "to

determine if she could deny [Plaintiff] coverage under workers['] compensation";

Plaintiff told Mr. Davis that she "would not be able to meet him at his hotel, but

asked him to come to her instead" and Sizemore "claimed that she refused to meet

with him". (Doc. 32 at 28.)[19] Plaintiff does not show that: Sizemore knew that

Plaintiff spoke with Ms. Rusk; Plaintiff sent the photos to Ms. Skywark or Mr. Eley;

Sizemore received the photos; or Ms. Skywark contacted the Department of Labor.

(*See id.*)

In addition, Sizemore explains that it had no reason to independently

interview Ms. Rusk because Ms. Rusk worked in a different facility, Ms. Rusk was

not in Plaintiff's chain of command, and Ms. Rusk did not witness the altercation.

(Doc. 36 at 4-5; *see* Doc. 26-3 at 21 (77:6-78:3).) The Court finds that Sizemore's

explanation for not interviewing Ms. Rusk is plausible.

Plaintiff does not identify the information that she would have provided to

Mr. Davis had she met with him in person. (Doc. 32 at 28.) Plaintiff does not explain

why she needed to meet with Mr. Davis in person instead of providing Sizemore

---

[19] Plaintiff also asserts that Mr. Rittenberry's signed statement contradicts an oral statement that
he provided during the investigation. (Doc. 32 at 28-29.) Plaintiff raised this argument and the
Court already found that it lacks merit. (*See supra* at n.14.)

with additional information via email or telephone. (*See id.*) Mr. Davis's decision to not meet with Plaintiff in her home does not make Sizemore's reason for terminating Plaintiff "unworthy of credence."[20] Thus, Plaintiff has not shown that Sizemore's reason for terminating Plaintiff really is a pretext for unlawful discrimination.

Alternatively, if Plaintiff had identified a problem with Sizemore's investigations, a flawed investigation is insufficient to demonstrate that Sizemore's reason for terminating Plaintiff is pretext. *See Duckworth v. Pilgrim's Pride Corp.*, No. 18-11006, 2019 WL 1531844, at *3 (11th Cir. Apr. 9, 2019) ("[E]mployers may fire an employee for '. . . a reason based on erroneous facts . . . as long as its action is not for a discriminatory reason.'"); *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1207 (11th Cir. 2013) (stating that if an employer provides an honest explanation, a court is "not in a position to 'second-guess [its] business judgment[.]'" (first alteration in original)). Thus, Plaintiff's argument that Sizemore's investigation was flawed lacks legal force.

Accordingly, Plaintiff fails to meet her burden under the *McDonnell Douglas* framework with respect to her claim of disability discrimination based on Sizemore's termination of her job.

---

[20] Plaintiff's email creates a discrepancy regarding her statement that she offered to conduct the interview at her home. In her email, Plaintiff wrote "he could have came to me but didn't offer [to do] so." (Doc. 34-1 at 34.) In the context of this motion, the Court construes the facts in a light most favorable to Plaintiff, but for purposes of deciding the instant motions the Court does not need to determine if Plaintiff asked Mr. Davis if he could come to her home.

### iii. Whether Sizemore treated Plaintiff differently than able-bodied employees with respect to working on a "light duty" shift

Plaintiff stated that Sizemore permitted other employees to work "on light duty without a doctor's release, while [Plaintiff] had been denied." (Doc. 32 at 27.) Plaintiff claims that Sizemore permitted Adrian Menchaca to return to work without a doctor's release. (Doc. 26-3 at 36 (138:20-139:3).) Plaintiff testified that Mr. Menchaca "was driving a vehicle while intoxicated and had a wreck[,]" and that he was permitted to work on light duty. (Doc. 26-3 at 35-36 (133:21-134:2, 139:13-19).) Plaintiff admitted that she did not know whether Mr. Menchaca was restricted by his doctor from returning to work. (Doc. 26-3 at 36 (140:16-20).)

The U.S. Court of Appeals for the Eleventh Circuit held that "a plaintiff asserting an intentional-discrimination claim under *McDonnell Douglas* must demonstrate that she and her proffered comparators were similarly situated in all material respects. *Lewis v. Union City*, 918 F.3d 1213, 1218 (11th Cir. 2019) (en banc). The *Lewis* Court provided guideposts for determining whether an employee is similarly situated in all material respects, such as:

> engag[ing] in the same basic conduct (or misconduct) as the plaintiff; . . . hav[ing] been subject to the same employment policy, guideline, or rule as the plaintiff; . . . ordinarily (although not invariably) hav[ing] been under the jurisdiction of the same supervisor as the plaintiff; and . . . shar[ing] the plaintiff's employment or disciplinary history.

*Id.* at 1227 (citations omitted).

Mr. Menchaca is not a similarly situated comparator to Plaintiff for three reasons. First, Plaintiff has not shown that she and Mr. Menchaca were subject to the same Sizemore employment policy. Second, Plaintiff's doctor restricted her from work (Doc. 26-3 at 62, 64), but Mr. Menchaca's medical status is unknown. Third, Sizemore reasonably complied with the doctor's recommendation on Plaintiff's work restrictions. Plaintiff has not shown that Sizemore permitted Mr. Menchaca to work despite a work restriction. Thus, Plaintiff's argument that Sizemore treated other employees differently from Plaintiff is unconvincing.

Accordingly, Plaintiff fails to establish a prima facie case of disability discrimination because Plaintiff's use of a comparator does not show that Sizemore treated able-bodied individuals better than Plaintiff.

### iv. Summary

For the reasons stated above, the Court shall grant Sizemore's motion for summary judgment as it relates to Plaintiff's ADA disparate treatment claim.

### B. Disability Discrimination – Reasonable Accommodations

Plaintiff alleges that Sizemore discriminated against her on the basis of her disability by failing to provide a reasonable accommodation. Sizemore argues that Plaintiff's claim fails because she did not request a reasonable accommodation. (Doc. 25 at 21.)

Discrimination under the ADA includes "not making reasonable accommodations to the known physical . . . limitations of an otherwise qualified individual . . . ." 42 U.S.C. § 12112(b)(5)(A). "An employer's failure to provide reasonable accommodation to a disabled individual is itself discrimination, and the plaintiff does not bear the additional burden of showing that the employer intentionally acted in a discriminatory manner toward its disabled employees." *Hudson v. Tyson Farms, Inc.*, No. 18-10476, 2019 WL 1897064, at *4 (11th Cir. Apr. 29, 2019) (citing *Holly*, 492 F.3d at 1262). "The plaintiff bears the burden both to identify an accommodation and to show that it is reasonable." *Id.* (citing *Willis v. Conopco, Inc.*, 108 F. 3d 282, 284-86 (11th Cir. 1997)). The plaintiff must show that he made a demand for the accommodation. *See Wood v. President & Trs. of Spring Hill Co. in the City of Mobile*, 978 F.2d 1214, 1222 (11th Cir. 1992) ("[R]easonable accommodation was simply not an issue in this case. [The plaintiff] never alleged, much less established, that she demanded any reasonable academic accommodations from the college because of her handicap.").

Plaintiff argues she requested "to return to work, with or without accommodation." (Doc. 32 at 31.) Plaintiff's requests to return to work *without an accommodation* are irrelevant for purposes of this claim because Plaintiff must show that she *sought an accommodation*. *See Hudson*, 2019 WL 1897064, at *4. Further, Plaintiff does not state when she requested an accommodation or describe the

accommodation. (*See* Doc. 32 at 31.) In an October 6, 2015 email, Plaintiff wrote to Ms. Skywark, "You told me the company didn't have light duty for me . . . ." (Doc. 34-1 at 30.) This email does not show that Plaintiff requested light duty as an accommodation from Ms. Skywark. In addition, Ms. Skywark stated, "[Plaintiff] never requested to return to work during her workers' compensation leave . . . ." (Doc. 26 ¶ 18.) Thus, Plaintiff fails to satisfy her burden of showing that she demanded an accommodation.

Assuming, for argument's sake, that Plaintiff did request light duty as an accommodation, Plaintiff still fails to meet her burden of showing that such an accommodation was reasonable. Plaintiff's doctor twice advised that Plaintiff not work. (Doc. 26-3 at 61, 64.) Ms. Skywark stated that Sizemore did not consider allowing Plaintiff to work because of the medical restriction. (Doc. 26-1 ¶ 18.) Sizemore reasonably chose to follow Plaintiff's doctor's recommendation in not permitting her to return to work. A reasonable accommodation is one that "enables the employee to perform the essential functions of the job." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1259-60 (11th Cir. 2001). Considering Plaintiff's doctor's restrictions, Sizemore could not accommodate Plaintiff and Sizemore had no obligation to alter the position by eliminating the essential functions of the job. *See id.* ("While . . . the ADA may require an employer to restructure a particular job by altering or eliminating some of its marginal functions, employers are not required to

transform the position into another one by eliminating functions that are essential to the nature of the job as it exists.").

Plaintiff argues that she was working with an "accommodation" prior to her August 25, 2015 injury. (Doc. 32 at 31.) Plaintiff's argument, which implies that Sizemore should have permitted her to return to work, ignores that Plaintiff's physician recommended a total work restriction. Plaintiff also argues that Sizemore "refused to engage in the interactive process and discuss any other position that might be suitable for [Plaintiff]." (*Id.*) Plaintiff's argument finds no factual support in the record. Plaintiff fails to show that she suggested other accommodations, asked Sizemore if other types of accommodations were available, or requested a discussion with Sizemore about jointly developing an accommodation.

Accordingly, Sizemore's motion for summary judgment with respect to Plaintiff's disability discrimination, reasonable accommodation claim is due to be granted.

## C. Sex Discrimination

Plaintiff alleges a claim against Sizemore and Hyosung titled "Sex Discrimination in Violation of Title VII" and asserts that she was subjected to "gender discrimination and a hostile work environment because she is a female, including disparate treatment, retaliation and termination." (Doc. 1 at 8; Doc. 32 at

32.)[21] Title VII makes it unlawful for an "employer" "to discharge . . . or otherwise to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a). Sexual harassment can constitute discrimination under Title VII. *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 508 (11th Cir. 2000).

### i. Defendant Hyosung

Defendant Hyosung argues that it is entitled to summary judgment on Plaintiff's Title VII claims because Hyosung is not Plaintiff's "employer" pursuant to Title VII. (Doc. 2 at 14.) Plaintiff argues that Hyosung constitutes an employer under a "joint employer" theory. (Doc. 33 at 24 (citing *Virgo v. Riviera Beach Assocs.*, 30 F.3d 1350, 1359-60 (11th Cir. 1994)).

Two or more businesses may be held liable for violations of Title VII under a "joint employer" theory of recovery. *See Virgo*, 30 F.3d at 1359-60; *Cole v. Gestamp North Am., Inc.*, No. 2:19-cv-00056-JHE, 2019 WL 1875357, at *3 (N.D. Ala. Apr. 26, 2019) (recognizing the application of the "joint employer" theory of

---

[21] Sizemore states that it "does not understand Plaintiff's distinction. Claims for disparate treatment, retaliation and termination are potential causes of action under Title VII, but they are not the same thing as a sexually hostile work environment. In fact, Plaintiff makes separate claims for discrimination in termination and retaliation . . . ." (Doc. 36 at 8.)

recovery in Title VII cases). The Eleventh Circuit stated the standard for determining

who qualifies as an employer under Title VII:

> Consistent with the remedial purposes of Title VII, the federal courts have interpreted the term "employer" liberally. *Virgo*, 30 F.3d at 1359. Thus, in order to decide whether an entity is a qualified employer, we have asked this basic question: "who (or which entity) is in control of the fundamental aspects of the employment relationship that gave rise to the claim." *Lyes v. City of Riviera Beach*, 166 F.3d 1332, 1345 (11th Cir. 1999) (en banc). An examination of this question requires consideration of the totality of the employment relationship. *Welch*[ *v. Laney*], 57 F.3d [1004,] 1011 [(11th Cir. 1995)] (citing *Wirtz v. Lone Star Steel Co.*, 405 F.2d 668, 669-70 (5th Cir. 1968)). Among the basic factors we consider are these: (1) how much control the alleged employer exerted on the employee, and (2) whether the alleged employer had the power to hire, fire, or modify the terms and conditions of the employee's employment. *Welch*, 57 F.3d at 1011; *Llampallas*[ *v. Mini-Circuits, Lab, Inc.*], 163 F.3d [1236,] 1243[(11th Cir. 1998)].

*Peppers v. Cobb Cnty, Ga.*, 835 F.3d 1289, 1297 (11th Cir. 2016).

Plaintiff argues that Hyosung constitutes an employer for purposes of being liable for her Title VII claim because "[Hyosung] had the right to direct the terms and duties of her employment and it could dictate the termination of her employment with Hyosung. [Plaintiff] had supervisors she reported to for both Hyosung USA, Inc. and Sizemore, Inc." (Doc. 33 at 25.)

The Court rejects Plaintiff's argument for three reasons. First, Plaintiff does not cite evidence to support this argument. (*See id.*) Plaintiff does not show that Hyosung "had the right to direct the duties of her employment," and Plaintiff does not identify the Hyosung supervisors to whom she reported. (*See id.*) Second,

pursuant to Hyosung's agreement with Sizemore, Hyosung has the right to "request the removal of any Sizemore employee." (Doc. 34-1 at 49.) Yet, that provision allows Hyosung to make a request that Sizemore may not honor. In effect, Sizemore retains the power to terminate Plaintiff. Third, Plaintiff does not show that removal from a Hyosung facility equates to employment termination. Thus, the Court finds that Plaintiff has failed to show that Hyosung had the ability to terminate Plaintiff's employment.

Considering the *Peppers* factors, the Court finds that Plaintiff has failed to show that (1) Hyosung had exerted control on Plaintiff; and that (2) Hyosung had the power to hire, fire, or modify the terms and conditions of Plaintiff's employment. Therefore, considering the totality of Plaintiff's employment relationship, Plaintiff has failed to show that Hyosung controlled any of the fundamental aspects of Plaintiff's employment relationship directly with Plaintiff that gave raise to Plaintiff's Title VII claim.

As a result, the Court finds that Hyosung is not Plaintiff's employer under a "joint employer" theory. Hyosung, therefore, is not liable to Plaintiff in connection with Plaintiff's Title VII claims. Accordingly, Hyosung's motion for summary judgment is due to be granted regarding Plaintiff's Title VII claims.

### ii. Defendant Sizemore

#### 1. *Hostile Work Environment – Sexual Harassment*

To establish a claim of a hostile work environment based on sex (sexual harassment), a plaintiff must show:

> (1) that she belongs to a protected group; (2) that she has been subjected to unwelcome sexual harassment; (3) that the harassment was based on her sex; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that a basis for holding the employer liable exists.

*Hulsey v. Pride Rests., LLC*, 367 F.3d 1238, 1244 (11th Cir. 2004) (citing *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc)).

Sizemore argues that "there is no evidence to support a claim that Plaintiff was subjected to severe or pervasive harassment based on gender to create a discriminatorily abusive working environment." (Doc. 36 at 8.) Plaintiff does not make an argument supporting any of the factors of the prima facie case. (*See* Doc. 32 at 32-34.) The Court recognizes that Plaintiff belongs to a protected group as a woman. *See Johnson*, 234 F.3d at 508 (stating that plaintiff belonged to a protected group as a woman.). Plaintiff, however, fails to establish a genuine issue of material fact with respect to the other elements of a hostile work environment claim. Therefore, Sizemore's motion for summary judgment is due to be granted with respect to Plaintiff's sex discrimination hostile work environment claim.

## 2. Sex Discrimination in Termination

To establish a prima facie case of Title VII discrimination a plaintiff must show that she: "(1) is a member of a protected class; (2) was qualified for the

position; (3) suffered an adverse employment action; and (4) was replaced by someone outside the protected class or was treated less favorably than similarly situated individuals outside the protected class." *Cunningham v. Florida Credit Union*, 758 Fed. App'x 902, 904 (11th Cir. 2019) (quoting *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1312 n.7 (11th Cir. 2018)). If the plaintiff establishes a prima facie case, then "the burden of production shifts to the defendant to present evidence of a 'legitimate, non-discriminatory reason for the challenged action.'" *Id.* (quoting *Hornsby-Culpepper*, 906 F.3d at 1312). If the defendant satisfies its burden of production, then "the burden shifts back to the plaintiff to introduce evidence that the proffered reason was a 'mere pretext for discrimination.'" *Id.* (quoting *Hornsby-Culpepper*, 906 F.3d at 1312).

In *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011), the Eleventh Circuit clarified that the *McDonnell Douglas* framework "was not intended to be" the only method "for a plaintiff to survive a summary judgment motion in an employment discrimination case." "Rather, the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id.* The Eleventh Circuit explained:

> A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decision maker." *Silverman*[ *v. Board of*

*Educ.*], 637 F.3d [729,] 734 [(11th Cir. 1997)] (citations and internal quotation marks omitted); *see also James v. N.Y. Racing Ass'n,* 233 F.3d 149, 157 (2d Cir.2000) ("[T]he way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove—particularly discrimination.").

*Id.* (last alteration in original).

A plaintiff may also show discrimination with direct or circumstantial evidence under a mixed-motive claim framework. *Quigg v. Thomas Cty. Sch. Dist.,* 814 F.3d 1227, 1235 (11th Cir. 2016). In a mixed-motive claim framework, a plaintiff can establish his or her claim by showing that illegal bias (such as gender) motivated the employer's adverse employment action, even though legitimate reasons also motivated the employer's action. *Id.* In the mixed-motive framework, a court considers whether there is sufficient evidence that: "(1) the defendant took an adverse employment action against the plaintiff; and (2) a [protected characteristic] was a motivating factor for the defendant's adverse employment action." *Id.* at 1239 (alteration in original). Under the mixed motive theory, the defendant still has the opportunity to show that it would have made the same decision in any event, which allows the employer to avoid damages and certain types of equitable relief under Title VII. *Id.* at 1239 n.9.

Plaintiff presents case law for both single-motive and mixed-motive claims. (*See* Doc. 32 at 32-34.) Yet, Plaintiff makes a single-motive *McDonnell Douglas* burden shifting framework argument. (*See* Doc. 32 at 35-36.) In contrast to a mixed-

motive claim, Plaintiff does not acknowledge that Sizemore also had a legitimate basis upon which to terminate her employment. (*See id.*) Therefore, the Court does not analyze Plaintiff's claim under the "convincing mosaic of circumstantial evidence" or the mixed-motive framework set forth in *Quigg. See Williams v. Fla. Atl. Univ.*, 728 F. App'x 996, 999 (11th Cir. 2018) (holding that although a plaintiff is not required to plead a "mixed-motive" theory, he or she is "required to argue that [his or] her case involved mixed-motives '[a]t some point in the proceedings'" to warrant consideration of the theory. (second alteration in original)).

Sizemore argues that Plaintiff is not able to establish a prima facie case because Plaintiff cannot identify a similarly-situated comparator who falsely reported a workplace assault and injury. (Doc. 36 at 8.) Sizemore also argues that Plaintiff cannot show Sizemore's reason for her termination was pretext. (*Id.* at 8-9.)

Plaintiff argues that she is member of a protected class because she is a woman, and that Sizemore's termination of Plaintiff's employment is an adverse employment action. (Doc. 32 at 37.) Sizemore does not contest that Plaintiff is a member of a protected class or that the termination is an adverse employment action. (*See* Doc. 25 at 26-27; Doc. 36 at 8-9.) Thus, Plaintiff has established the first and third factors.[22]

---

[22] The prima facie case includes four factors, *see Cunningham*, 758 Fed. App'x at 904, but Plaintiff

To show the presence of the fourth factor, Plaintiff argues that evidence of "disparate treatment exists" because she made a complaint of sex discrimination that male employees had been "hired or promoted over her" and that "[n]o investigation was ever conducted based on her complaint . . . ." (Doc. 32 at 37-38.) Plaintiff's argument is premised on evidence that the Court has stricken based on Defendants' objections. Thus, Plaintiff's argument lacks evidentiary support, and, as a result, is unpersuasive.

As an alternative approach to establishing the fourth factor, Plaintiff makes an argument that conflates the fourth factor with her burden to show that Sizemore's reason for her termination was pretext. Plaintiff argues that Sizemore's investigation of the altercation with Mr. Graham was flawed. (*See* Doc. 32 at 38.)[23] Assuming,

---

does not address the second factor (*see* Doc. 32 at 37-38). Sizemore has not, however, argued that Plaintiff was not otherwise qualified for the position. Thus, the Court does not find that Plaintiff fails to establish a prima facie case due to her failure to discuss this factor.

[23] In particular, Plaintiff states that Sizemore:

> ignored a discrepancy in [Mr. Rittenberry's] recorded testimony . . . , ignored the photos . . ., and failed to talk to [Ms. Rusk] . . . . When [Plaintiff] complained about the disparate treatment . . . [regarding] male employees who were not terminated for serious offenses such as driving under the influence and taking drugs while on the job, Sizemore did nothing to investigate her claims.

(Doc. 32 at 38.) The Court has also addressed most of these issues when discussing whether Sizemore terminated Plaintiff because of her disability. Plaintiff references other employees who used drugs and drove while under the influence. (*Id.*) Yet, Plaintiff does not explain why these other individuals are similarly situated to her. (*See id.*) Plaintiff does not admit that she used drugs at work or drove under the influence at work. (*See id.*) Thus, Sizemore would have no reason to investigate any claims relating to that activity in connection with investigating Plaintiff's conduct.

*arguendo*, that Plaintiff had identified a failure in Sizemore's investigation, a flawed investigation is insufficient to demonstrate that Sizemore's reason for terminating Plaintiff is pretext. *See Duckworth*, 2019 WL 1531844, at *3 (11th Cir. Apr. 9, 2019) ("[E]mployers may fire an employee for '. . . a reason based on erroneous facts . . . as long as its action is not for a discriminatory reason[,]'" quoting *Flowers v. Troup Cty., Sch. Dist.*, 803 F.3d 1327, 1338 (11th Cir. 2015)). See also, *Kidd*, 731 F.3d at 1207 (stating that if an employer provides an honest explanation a court is "not in a position to 'second-guess [its] business judgment[,]'" quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (first alteration in original)). Thus, Plaintiff's argument that Sizemore's investigation was flawed lacks persuasive weight.

Plaintiff also argues that she "was replaced by a male . . . a male was hired to perform her job duties under the guise of a different job title." (Doc. 32 at 39.) Plaintiff has not identified evidence that Sizemore changed the title of her job to replace her with a male. (*See id.*) In addition, Plaintiff has not explained how her former janitorial supervisor position is the same position as the maintenance assistant. (*See id.*) Thus, Plaintiff's argument is unconvincing.

Plaintiff fails to establish a prima facie case of sex discrimination in connection with her termination. Therefore, Sizemore is entitled to summary judgment with respect to this claim.

### 3. Sex Discrimination in Terms and Conditions of Employment

The Court has discussed the standard for establishing a Title VII discrimination claim above. In connection with her Title VII sex discrimination in terms and conditions of employment claim, Plaintiff makes a single-motive *McDonnell Douglas* burden shifting framework argument. (*See* Doc. 32 at 38-41.) Plaintiff alleges that Sizemore discriminated against her based on her sex because Sizemore placed Plaintiff on leave after she was injured and did not permit Plaintiff to return to work (specifically, to work a light duty shift). (Doc. 1-1 ¶ 31; Doc. 1-1 at 2.)

Sizemore argues that Plaintiff cannot establish a prima facie case because Plaintiff cannot show that she suffered an adverse employment action, or that Sizemore permitted a similarly situated comparator to return to work. (Doc. 25 at 28 n. 3.) Sizemore also argues that Plaintiff cannot show that Sizemore's reason to place Plaintiff on leave was a pretext for discrimination. (*See id.*)

Plaintiff does not attempt to show the elements of a prima face case. As a result, Plaintiff fails to establish a prima facie case of sex discrimination based on the terms and conditions of her employment because she has not shown the prima facie elements of her claim. For example, Plaintiff does not show that Sizemore's determination to keep Plaintiff on leave, consistent with her doctor's recommendation, constitutes an adverse employment action. (*See* Doc. 32 at 39-41.)

In addition, Plaintiff does not show that Sizemore treated her less favorably than similarly situated males. Thus, Plaintiff has failed to establish her claim for discrimination based on sex discrimination related to the terms and conditions of her employment.

Assuming, for argument's sake, that Plaintiff had established a prima facie case, Plaintiff is unable to demonstrate that Sizemore's reason for terminating her was pretext. Plaintiff argues that Sizemore's reason is pretext because she has presented evidence, including photos, a police report, and medical records, showing that her injury complaint was true. (Doc. 32 at 40.)[24] Plaintiff's evidence shows that she was injured at some point and provided another report of the altercation. Yet, Plaintiff's evidence does not show that her report was accurate (in other words that Mr. Graham pushed her). For example, Plaintiff's photos may reflect that she incurred an injury, but the photos do not show that Mr. Graham *caused* the injury. Thus, Plaintiff's argument lacks persuasive force.

Even if Plaintiff showed her report was accurate, a flawed investigation is insufficient to demonstrate that Sizemore's reason for terminating Plaintiff is pretext. *See Duckworth*, 2019 WL 1531844, at *3 ("[E]mployers may fire an

---

[24] Plaintiff's reference to a "police report" appears to refer to a complaint that was filed in the Municipal Court of Decatur, Alabama. (Doc. 34-1 at 13-15.) Plaintiff also refers to a compensation settlement agreement. (*See id.*) The Court will not consider that document because the Court has stricken the document.

employee for '. . . a reason based on erroneous facts . . . as long as its action is not for a discriminatory reason.'"); *Kidd*, 731 F.3d at 1207 (stating that if an employer provides an honest explanation, a court is "not in a position to 'second-guess [its] business judgment[.]'" (first alteration in original)). Thus, Plaintiff's argument that her report was accurate is inapplicable.

Accordingly, Sizemore's motion for summary judgment is due to be granted with respect to Plaintiff's claim for sex discrimination based on the terms and conditions of her employment.

### D. Retaliation under ADA or Title VII

To establish a prima facie case of retaliation under Title VII or the ADA, a plaintiff must show that he or she: "(1) engaged in a statutorily protected activity; (2) suffered an adverse employment action; and (3) established a causal link between the protected activity and the adverse action." *McQueen v. Alabama Dept. of Transp.*, No. 17-13405, 2019 WL 1773270, at *4 (11th Cir. Apr. 23, 2019) (citing *Bryant v. Jones*, 575 F.3d 1281, 1307-08 (11th Cir. 2009)) (stating a prima facie case for a Title VII retaliation claim); *Bugo-Stefanelli v. Secretary, U.S. Dept. of Homeland Sec.*, 410 Fed. App'x 243, 245 (11th Cir. 2011) ("[W]e assess [ADA] retaliation claims . . . under the framework we use in assessing Title VII retaliation claims."). A court analyzes retaliation claims under the burden-shifting framework. *See Brown v. Alabama Dept. of Transp*, 597 F.3d 1160, 1181 (11th Cir. 2010)

(stating that the burden-shifting analysis applies to cases of retaliation relying on circumstantial evidence in the context of a Title VII case).

Alternatively, a plaintiff may establish a Title VII discrimination retaliation claim by presenting a "'convincing mosaic of circumstantial evidence'" that permits an inference of discrimination. *Lewis*, 918 F.3d at 1220 n.6 (quoting *Smith*, 644 F.3d at 1328); *see Calvert v. Doe*, 648 Fed. App'x 925, 929 (11th Cir. 2016) (applying convincing mosaic standard to the plaintiff's Title VII retaliation claim).

Plaintiff's arguments, however, are premised on the burden-shifting framework. (*See* Doc. 32 at 41-46.) The Court, therefore, analyzes Plaintiff's claims under that burden-shifting framework.

### i. Defendant Hyosung

As stated above, the Court finds that Hyosung is not Plaintiff's employer. Therefore, Plaintiff's Title VII and ADA retaliation claims against Hyosung fail because those claims are premised on an employer's conduct. Accordingly, Hyosung's motion for summary judgment is due to be granted with respect to Plaintiff's Title VII and ADA retaliation claims.

### ii. Defendant Sizemore

Plaintiff claims that Sizemore retaliated against her "for complaining of disparate treatment and harassment because of [her] gender, and/or because of a perceived disability." (Doc. 1-1 at 2.) Sizemore argues that Plaintiff cannot establish

a prima facie case because Plaintiff did not engage in protected activity prior to her termination, and Plaintiff cannot show a causal link between her protected activity and an adverse action. (Doc. 25 at 30.) Additionally, Sizemore argues that Plaintiff cannot show that Sizemore's reason is pretext. (*Id.* at 31.)

"Statutorily protected activity" consists of either opposition to a practice that is unlawful under Title VII or participation in a Title VII proceeding. 42 U.S.C. § 2000e–3(a). The Eleventh Circuit stated "[s]tatutorily protected expression includes filing complaints with the EEOC and complaining to superiors about sexual harassment." *Johnson*, 234 F.3d at 507. The Eleventh Circuit explained that:

> Title VII's protections are not limited to individuals who file formal complaints, but extend to those who voice informal complaints as well. *Rollins v. State of Fla. Dep't of Law Enf't*, 868 F.2d 397, 400 (11th Cir. 1989). However, the statute's protections only reach individuals who "explicitly or implicitly communicate[ ] a belief that the practice constitutes unlawful employment discrimination." EEOC Compl. Man. (CCH) § 8–11–B(2) (2006).

*Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1311 (11th Cir. 2016) (alteration in original).

Plaintiff asserts that she opposed practices unlawful under Title VII by (i) reporting her altercation with Mr. Graham; and (ii) complaining about harassment and retaliation. Specifically, Plaintiff states:

> [she] was injured on August 25, 2015 and reported the injury. She complained that she was being harassed, and that she was being retaliated against because of engaging in federally protected activity. [Plaintiff] was not allowed to return to work, and was terminated less

than six weeks after the August 25, 2015 incident, evidence of its causal connection.

(Doc. 32 at 42.) Plaintiff explains that her complaints of harassment and retaliation consist of four emails that she sent on September 18, 2015, September 24, 2015, September 25, 2015, and September 28, 2015. (Doc. 32 at 5.)

Plaintiff identified the September 24, 2015, email which shows that someone forwarded a job posting from a job search website. (*See* Doc. 34-1 at 24.) The Court finds that this job announcement does not constitute a complaint of harassment.

The Court addresses Plaintiff's other three emails together. On September 18, 2015, Plaintiff sent an email to Mr. Eley and Ms. Skywark stating:

> OK since you want [sic] answer any of my phone calls. I want to know why I am supposed to call Andrea [S]kywark and see Jim [G]arner before I return to work after off workers [sic] comp. I just talked to [B]ill in security checking on the squeegee order I asked you to order and was informed of all of this. So to me this sounds as though it is in place to terminate my employment contract and services as soon as or if I come off workers [sic] comp due to the extent of my injuries. So it sounds as though you have let everyone know that I have been terminated[.]

(Doc. 34-1 at 22.) On September 25, 2015, Plaintiff sent an email to Ms. Skywark stating:

> It has been brought to my attention that Allan Davis has been interviewing [H]yosung employees about me. I have informed my attorney of this today. It seems as though both companies are slandering me and harassing me a month after the assault. I will have everyone of them subpoena for their perjury. Now when it comes to my medical and works comp I will cooperate but now you have taken this to a legal issue.

Perjury on the stand will be proven on these employees about me and those in security that brought it to my attention.

Malicious lies, slander, defamation of character, harassment, and so on this far.

(Doc. 34-1 at 26.) On September 28, 2015, Plaintiff sent an email to Ms. Skywark stating:

What's going to happen to my 3 weeks of vacation time since my job has been posted on indeed.com and is apparent that I am being terminated.

Andrea, I could not control the fact that a man assaulted me and caused me to get injured and for having to file for workers comp. I had no idea I would get fired for filing for it. I am so distraught because I need my job and did not violate any policies. This was not my fault. I would have thought Sizemore would have protected me better. But it appears all anyone is concerned with is not losing the [H]yosung account. I went above and beyond for this company and even got them the intergraph acct.

(*Id.* at 28.) In her September 25, 2015 email, Plaintiff refers to harassment. (*Id.* at 26.) Yet, Plaintiff does not explicitly or implicitly communicate that she believes the harassment is employment discrimination in the September 18, 2015, September 25, 2015, or September 28, 2015, emails. Thus, these emails do not constitute protected activity.

Accordingly, Plaintiff fails to establish the first prong of a prima facie case of Title VII or ADA retaliation.

Assuming, for purposes of argument, that Plaintiff had established a prima facie case, her claim would still fail because Plaintiff fails to establish that Sizemore's reason for her termination was pretext. Plaintiff does not present a pretext argument to support her retaliation claim beyond the pretext arguments she made with respect to her other claims. (*See* Doc. 32 at 41-46.) The Court has determined that those arguments are unpersuasive.

Accordingly, Sizemore's motion for summary judgment is due to be granted with respect to Plaintiff's Title VII and ADA retaliation claims.[25]

### E. State Law Claims

A court may decline to exercise supplemental jurisdiction over a state law claim once "the district court has dismissed all claims over which it has original jurisdiction[.]" 28 U.S.C. § 1367(c)(3). To determine whether to exercise supplemental jurisdiction over a state law claim, a court must "take into account concerns of comity, judicial economy, convenience, fairness, and the like." *Lewis v. City of St. Petersburg*, 260 F.3d 1260, 1267 (11th Cir. 2001) (internal quotation marks omitted) (quoting *Crosby v. Paulk*, 187 F.3d 1339, 1352 (11th Cir. 1999)). The Eleventh Circuit has "encouraged district courts to dismiss any remaining state

---

[25] The Court does not need to address the parties' arguments regarding the third element of a prima facie case of retaliation because the Court found that Plaintiff has failed to establish a prima facie case.

claims when . . . the federal claims have been dismissed prior to trial." *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1089 (11th Cir. 2004).

In light of this guidance, the Court finds that it is appropriate to decline supplemental jurisdiction over Plaintiff's remaining state law claims. In addition, another judge on this Court has acknowledged that "[s]tate courts, not federal courts, should be the final arbiters of state law." *Flippo v. Am. Power Source, Inc.*, 20 F. Supp. 3d 1299, 1319 (N.D. Ala. 2014) (citing *Hardy v. Birmingham Bd. of Educ.*, 954 F.2d 1546, 1553 (11th Cir. 1992)). The Court's decision to decline supplemental jurisdiction over Plaintiff's state law claims is consistent with principles of comity. *See, e.g., Estate of Smith v. Forest Manor, Inc.*, No. 7:16-cv-01774-RDP, 2018 WL 2770203, at *10 (N.D. Ala. June 8, 2018).   And Plaintiff suffers no prejudice as to her state law claims, due to the tolling of any period of  limitations as delineated in 28 U.S.C.A. § 1367(d).[26]

Therefore, the court declines to continue to exercise supplemental jurisdiction over Plaintiff's state law claims. The Court shall dismiss these claims without prejudice so that Plaintiff may file these claims in state court.

---

[26] (d)  The period of limitations for any claim asserted under subsection (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period.  28 U.S.C.A. § 1367(d), recently addressed in *Artis v. D.C.,* 138 S. Ct. 594, 605, 199 L. Ed. 2d 473 (2018).

Because the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims, the Court shall not rule on Defendants' motions for summary judgment with respect to Plaintiff's claims for: (1) assault and battery; and (2) negligent and/or wanton hiring, training, supervision and retention.

## V.    CONCLUSION

For the reasons stated above, Sizemore's motion to strike (Doc. 37) is due to be  GRANTED.  Hyosung and Mr. Graham's motion to strike (Doc. 39) is due to be GRANTED IN PART as to emails dated July 24, 2014; June 2, 2014; February 8, 2016; and the state court order approving the Workers' Compensation Settlement and DENIED IN PART as to the email dated September 18, 2015.

Accordingly, Sizemore's motion for summary judgment (Doc. 24) is due to be GRANTED IN PART with respect to Counts I, II, and III, and DENIED IN PART with respect to Counts IV, and V; and

Hyosung and Mr. Graham's motion for summary judgment (Doc. 21) is due to be GRANTED IN PART with respect to Counts I, II, and III, and DENIED IN PART with respect to Counts IV, and V.

The Court DECLINES to exercise supplemental jurisdiction over Counts IV, and V, and these claims are DISMISSED WITHOUT PREJUDICE pursuant to 28 U.S.C. § 1367(c).  A final judgment will be entered separately.

**DONE** and **ORDERED** this November 13, 2019.

**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE